**WTG GAS PROCESSING, L.P., Appellant,**

v.

**CONOCOPHILLIPS COMPANY, Targa Resources Texas GP LLC, Targa Resources, Inc., Targa Texas Field Services, LP, and Warburg Pincus, LLC, Appellees.**

No. 14–08–00019–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 2, 2010.

Judith R. Blackway, P. Michael Jung, Dallas, Frank G. Harmon, Kimberly Rose Stuart, Houston, Gregg Owens, Austin, for appellant.

Angus J. Dodson, Logan J. Beck, Michael Ernest Richardson, Morgan L. Copeland, Robert R. Burford, Houston, Darrell L. Barger, Corpus Christi, Richard L. Posen, New York, NY, for appellees.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and SEYMORE.

**CORRECTED OPINION**

CHARLES W. SEYMORE, Justice.

We withdraw our opinion of February 23, 2010 and substitute this corrected opinion in its place.

This suit arises from appellee, ConocoPhillips Company's ("ConocoPhillips"), sale of a natural-gas processing facility to appellees, Targa Resources Texas GP LLC, Targa Resources, Inc., Targa Texas Field Services, LP, and Warburg Pincus, LLC (collectively "Targa"),[1] instead of appellant, WTG Gas Processing, L.P. ("WTG"). WTG sued ConocoPhillips for breach of contract, fraud, and negligent misrepresentation and Targa for tortious interference with contract or prospective business relationship. The trial court granted separate motions for summary judgment filed by ConocoPhillips and Targa and signed a final judgment that WTG take nothing on all its claims.

In two issues, encompassing numerous sub-issues, WTG contends the trial court erred by granting summary judgment on the breach-of-contract claim against ConocoPhillips and the tortious-interference-with-contract claim against Targa. WTG challenges the grounds on which the trial court explicitly granted summary judgment. Both ConocoPhillips and Targa present cross-points, contending the summary judgments should be upheld on alternative grounds, which were denied by the trial court. As explained below, we agree with a cross-point raised by both Conoco-

Phillips and Targa, and, therefore, affirm the final judgment.

**I. BACKGROUND[2]**

WTG is a limited partnership which owns midstream natural-gas gathering and processing systems. In 2003, ConocoPhillips decided to sell several of its natural gas processing plants and pipelines, including San Angelo Operating Unit ("SAOU"), Louisiana Operating Unit ("LOU"), and Southeast New Mexico assets ("SENM"). ConocoPhillips engaged Morgan Stanley & Co., Incorporated ("Morgan Stanley") to conduct the sale.

Morgan Stanley issued a "Teaser," inviting interested parties to potentially bid on an individual asset or certain assets combined. After WTG signed a confidentiality agreement, Morgan Stanley gave WTG a Confidential Information Memorandum ("CIM"), which described the assets in more detail and outlined the progressive steps of the transaction process: interested parties submit a non-binding Indication of Interest ("IOI") containing requisite items; Morgan Stanley and ConocoPhillips will evaluate the IOIs and invite a limited number of bidders to attend a management presentation, participate in due diligence, receive further information, including a draft Purchase and Sale Agreement ("PSA"), and attend a site visit from which to submit bids; and upon evaluation of the final bids, Morgan Stanley will narrow the number of bidders and enter into final PSA negotiations. The CIM also provided in pertinent part:

> Morgan Stanley and ConocoPhillips reserve the right to ... negotiate with one

---

1. The "Targa" entities bought the assets, and Warburg Pincus financed a portion of the purchase. Because the same claims were asserted against these defendants, we refer to them collectively as "Targa."

2. The summary-judgment motions, responses, and record in this case are voluminous. We set forth only the facts pertinent to our disposition which nonetheless are somewhat extensive.

or more parties at any time and ... enter into preliminary or definitive agreements at anytime and without notice or consultation with any other parties. Morgan Stanley and ConocoPhillips also reserve the right, in their sole discretion, to reject any and all final bids without assigning reasons and to terminate discussions and/or negotiations at any time for any reason or for no reason at all.

After submitting an IOI for SAOU, WTG was invited to, and did, participate in the next stage of the process. Then, on October 30, 2003, via letter, Morgan Stanley invited WTG to submit a binding proposal and outlined the requirements for such a bid ("the bid procedures"). The proposal was required to include ConocoPhillips's draft PSA marked by WTG to show its proposed changes. Among other provisions, the bid procedures contained the following language:

- A Proposal will only be deemed to be accepted upon the execution and delivery by ConocoPhillips of a [PSA(s)].
- [ConocoPhillips] expressly reserves the right, in its sole discretion and at any time and for any reason, to exclude any party from the process or to enter into negotiations or a [PSA(s)] with any prospective purchaser or any other party ... and to reject any and all Proposals for any reason whatsoever.... [ConocoPhillips] also expressly reserves the right to negotiate at any time with any prospective purchaser individually or simultaneously with other prospective purchasers.... None of ConocoPhillips, its affiliates, representatives, related parties or Morgan Stanley will have any liability to any prospective purchaser as a result of the rejection of any Proposal or the acceptance of another Proposal at any time.

- Until the [PSA(s)] for this transaction is executed by ConocoPhillips and a purchaser, [ConocoPhillips], its affiliates and related parties shall not have any obligations to any party with respect to the contemplated transaction, and following such execution and delivery, the only obligations of ConocoPhillips, its affiliates and related parties will be to the other party to the [PSA(s)], and only as set forth therein.

By letter dated November 19, 2003, WTG submitted a "final binding bid" of $135.4 million for SAOU "[i]n accordance with the [CIM] ... and the [bid procedures]." WTG subsequently increased its bid to $145.4 million after being informed that its offer was lower than others under consideration but ConocoPhillips was more comfortable with WTG because of fewer changes needed to its PSA and the parties' past relationship. WTG was then informed by Morgan Stanley that it likely would be the winning bidder if it increased its bid to $148.4 million to make it comparable to another offer ConocoPhillips was considering. On December 10, 2003, WTG increased its bid to $148.4 million.

According to the deposition testimony of Dave Freeman (WTG's employee who was its principle contact for the transaction), on December 11, 2003, Garrett Rychlik (ConocoPhillips's Coordinator of Business Development responsible for managing the auction of SAOU), Robert Friedsam (Morgan Stanley), and Ryan Engle (Morgan Stanley), telephoned Freeman stating the following: ConocoPhillips had decided to "go forward with" WTG; ConocoPhillips and WTG had a "deal," ConocoPhillips had some "immaterial" changes—"wording" issues—to WTG's draft PSA; the parties would "proceed to get it signed"; and ConocoPhillips would forward a revised ver-

sion the next day or at least by December 15.

At that point, WTG's draft PSA was not in executable form and did not, among other omissions, fully describe the assets to be purchased or include all exhibits. WTG and ConocoPhillips did not thereafter engage in any negotiations relative to a PSA, ConocoPhillips made no counter proposal, and these parties never executed a PSA.

Meanwhile, in November and early December of 2003, Targa had submitted bids for multiple assets, including SAOU, and expressed a strong preference to make a group purchase. On December 10, Targa resubmitted a bid of $335 million for SAOU, SENM, and LOU combined and reiterated its interest in acquiring several assets in a single transaction.

However, as of December 11, ConocoPhillips had decided to pursue PSA negotiations with WTG for SAOU, Targa for LOU only, and another entity for SENM. During the days immediately following the December 11th phone conversation with WTG, several ConocoPhillips employees who were responsible for various aspects of the sale generated some internal e-mails. The e-mails reflected that, although Targa's single bid was higher than the total separate offers, ConocoPhillips viewed the separate sales as more optimal than a package sale to Targa. The employees discussed the status of the sale in light of this decision. Specifically, on December 12, Will Duey wrote William Earnest and Mary Pearce:

[W]e are moving forward with due diligence and PSA negotiations with DEFS for SENM, [WTG] for [SAOU] and [Targa] for LOU. It is our goal to have PSAs for SENM and [SAOU] mid-January and close both before the end of February. These dates are subject to both due diligence and HSR require-

ments; however, they seem achievable at this point in time. Because of [Targa's] requirements LOU is expected to close later. . . .

. . . .

Morgan Stanley is notifying the unsuccessful bidders that we are starting down the road with other parties.

About two hours later, William Earnest forwarded the message to John Lowe (a ConocoPhillips vice-president) stating:

fyi—We are going down the path of 3 sales vs. one transaction with Targa due to closing concerns (new entity), due diligence requirements and [PSA] mark-up by Targa. We have done deals with [WTG] and DEFS before and are more confident of closing with them. . . .

Later that day, Mary Pearce wrote to Sigmund Cornelius and William Earnest, warning of a potential "political problem" due to Targa's latest bid:

We had already released DEFS and WTG to start due diligence on SENM and [SAOU], respectively. We also believe that there is a high risk that Targa will whittle the price down and WTG will not and DEFS may not based on our past dealings. When we advised Targa that we would not stop the due diligence and give them an exclusive on the 3 properties, they become [sic] upset and threatened to not buy LOU. We do plan to tell them that we want to work with them on LOU and will give them the opportunity if the negotiations fall apart with our primaries. If they do not buy LOU—we have other options.

We wanted you to know as you may hear complaints from Targa. We are committed to obtain the best value as well as live with our deals.

On December 15, Will Duey e-mailed John Lowe, expressing:

[Targa] seem[s] to be fishing for a magic number rather than raising their bid or modifying the PSA that they marked up. It seems late to ask them to submit a new PSA as we have already started due diligence with DEFS and [WTG]. Certainly Targa is a great option if those deals fall apart.

Then, on December 15, Targa did submit another bid of $255 million for SAOU and LOU combined, recognizing a package purchase which also included SENM may "no longer be an option." Targa also made some concessions on terms and guaranteed flexibility relative to negotiating other terms in light of ongoing discussions with Morgan Stanley which clarified ConocoPhillips's "key considerations." Morgan Stanley forwarded this proposal to ConocoPhillips, noting it was a total premium of $22 million over the existing offers. ConocoPhillips indicated to Morgan Stanley that this offer had potential if the parties could negotiate other details. On December 19, Morgan Stanley informed Freeman that ConocoPhillips was considering another offer.

On December 22, Freeman e-mailed Rychlik (ConocoPhillips) inquiring about the status of the PSA in light of the December 11th phone conversation and offering a meeting between the parties' attorneys to discuss the PSA. Freeman stated WTG was anxious to conclude this transaction because it was in the process of purchasing another interdependent facility in the area. He also stated that WTG had completed some aspects of due diligence and requested permission to conduct further due diligence during the first week of January.

On the same day, Engle (Morgan Stanley) responded to Freeman's e-mail, confirming WTG could conduct the requested due diligence. Engle advised that ConocoPhillips's attorney for the sale process was on vacation for the remainder of December and could not devote significant time to the PSA that week, and "[a]s previously mentioned, we believe the two parties are close enough on the PSA that finalizing that document can be done in an expedious [sic] fashion (most likely during the week of Jan. 5)." Also that day, Rychlik confirmed to Freeman that ConocoPhillips was considering another offer, which included SAOU, and a decision about the new bid would not likely be made before January. Rychlik stated he was not "playing games" with WTG but ConocoPhillips had to consider the other offer. Freeman replied that WTG would be "extremely upset" if a transaction between WTG and ConocoPhillips were not consummated because it had offered a "premium" for SAOU and the complementary facility and would be "very upset" if ConocoPhillips took the other offer without giving WTG an opportunity to adjust its bid although it might not do so. The next day, Freeman expressed to Morgan Stanley and Rychlik via e-mail that allowing WTG to continue a brisk pace on due diligence would enable it to sign a PSA "as soon as the attorneys have negotiated the agreement."

Throughout late December 2003 and January and February of 2004, ConocoPhillips negotiated with Targa. During this period, WTG, ConocoPhillips, and Morgan Stanley continued to communicate, in writing or orally, regarding the status of the sale. WTG periodically apprised Morgan Stanley and ConocoPhillips regarding the status of WTG's due diligence efforts, and they kept WTG informed that ConocoPhillips was still evaluating the other offer.

At one point in early January, Freeman again asked if WTG would be given the opportunity to revise its bid before ConocoPhillips accepted the other offer. Morgan Stanley replied that ConocoPhillips

would likely proceed with the other party if its bid were the best offer but WTG was free to submit a revised bid before that time. J.L. Davis, owner of WTG, subsequently wrote two letters to Morgan Stanley stating WTG would not increase its offer because it believed the parties had an "agreement" on price, the offer was fair, and WTG had expended considerable resources and made another commitment based on advice it had been selected to purchase SAOU; expressing "keen disappointment" if the sale were not concluded; and reiterating WTG's "expectation that ConocoPhillips will honor its commitment to accept our bid."

Morgan Stanley then notified WTG that due diligence should be conducted at its own risk and reminded WTG the bid materials advised that ConocoPhillips could negotiate with any party until a PSA was signed. A few days later, Freeman informed ConocoPhillips and Morgan Stanley that once certain aspects of due diligence were complete, it would be prepared to "finalize and sign" a PSA. Subsequently, Morgan Stanley advised Freeman that negotiations with the other party were down to the "critical stage" but ConocoPhillips wanted to keep communications open with WTG as a "good alternative." Morgan Stanley inquired about WTG's status should ConocoPhillips decide to proceed with WTG. Freeman replied that WTG was "basically down to finalizing the PSA and verifying volumes."

On February 28, 2004, ConocoPhillips and Targa executed PSAs for SAOU and LOU. A few days later, Morgan Stanley informed Freeman that ConocoPhillips had now executed a "definitive agreement." The closing for the transaction with Targa occurred in April 2004.

In December 2005, WTG sued ConocoPhillips for breach of contract, fraud, and negligent misrepresentation and Targa for tortious interference with contract or prospective business relationship. ConocoPhillips and Targa each filed a traditional motion for summary judgment followed by a supplement to the motion. On October 2, 2007, the trial court signed a "Memorandum Opinion and Order" granting both motions for summary judgment and explaining at length the reasons for its decision. On October 4, 2007, the trial court signed a final judgment referencing its previous order and ruling that WTG take nothing on all its claims. WTG appeals the summary judgment in favor of both ConocoPhillips and Targa.[3]

## II. STANDARD OF REVIEW

A party moving for traditional summary judgment must establish there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215–16 (Tex.2003). A defendant moving for summary judgment must conclusively negate at least one element of the plaintiff's theory of recovery or plead and conclusively establish each element of an affirmative defense. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). If the defendant establishes its right to summary judgment, the burden shifts to the plaintiff to raise a genuine issue of material fact. *Id.* We review a summary judgment *de novo. Knott,* 128 S.W.3d at 215. We take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in favor of the nonmovant. *Id.*

---

**3.** WTG also sued Morgan Stanley, and the trial court granted summary judgment in its favor, which WTG does not challenge on appeal.

### III. CONOCOPHILLIPS'S MOTION FOR SUMMARY JUDGMENT

In its first issue, WTG contends the trial court erred by granting summary judgment in favor of ConocoPhillips on WTG's breach-of-contract claim.[4]

#### A. The Issues

ConocoPhillips moved for summary judgment on two alternative grounds: (1) WTG cannot prove existence of a valid contract because the evidence conclusively established there was no meeting of the minds; and (2) the statute of frauds bars WTG's claim.[5] In its responses, WTG addressed these grounds and also raised a promissory-estoppel defense to the statute-of-frauds contention.[6]

In its order, the trial court found a genuine issue of material fact on whether a contract was formed. However, the trial court concluded that an *enforceable* contract did not exist as a matter of law because there was no writing satisfying the statute of frauds and WTG failed to present evidence supporting its promissory-estoppel argument.

On appeal, WTG challenges both conclusions concerning the statute of frauds. In addition to arguing that the trial court correctly concluded the statute of frauds was not satisfied, ConocoPhillips raises two cross-points. In one such cross-point, ConocoPhillips challenges the trial court's ruling that there was a genuine issue of material fact on whether a contract was formed.

As discussed below, we agree that, as a matter of law, ConocoPhillips negated formation of a contract. Therefore, we need not address the statute-of-frauds issue and will uphold the summary judgment based on ConocoPhillips's cross-point. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625–26 (Tex.1996) (holding appellate court, when reviewing summary judgment, should consider all grounds on which the trial court ruled and the movant preserved for appellate review that are necessary for final disposition of appeal).[7]

---

4. WTG does not challenge summary judgment on its fraud and negligent-misrepresentation claims.

5. *See* Tex. Bus. & Com.Code Ann. § 26.01(a), (b)(4) (Vernon 2009) (providing that a promise or agreement for the sale of real property "is not enforceable unless the promise or agreement, or a memorandum of it, is (1) in writing; and (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.").

6. *See Nagle v. Nagle*, 633 S.W.2d 796, 800 (Tex.1982) (recognizing courts will enforce oral promise to sign instrument complying with statute of frauds if (1) promisor should have expected his promise would lead promisee to some definite and substantial injury, (2) such injury occurred, and (3) court must enforce promise to avoid injustice).

7. Although we need not address the statute-of-frauds issue, in essence, WTG maintains (1) a contract was memorialized in writing through ConocoPhillips's internal e-mails after the December 11th phone conversation, together with WTG's PSA and other documents relative to the bid process; or (2) alternatively, ConocoPhillips was estopped to raise the statute of frauds because WTG relied on ConocoPhillips's promise to sign a PSA when purchasing the complementary facility, missing an opportunity to buy another property, and expending funds on due diligence for SAOU. The trial court concluded that the December 12th e-mail from Mary Pearce to other ConocoPhillips employees included the material terms of an oral contract, if any, either in the e-mail or through incorporation of other documents, and was signed electronically; however, the e-mail did not include sufficient language of assent to show an agreement between the parties. The trial court also rejected the promissory-estoppel argument because (1) there was no evidence of a promise to sign a prepared, written agreement that would satisfy the statute of frauds, *see 1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192

## B. Analysis

■ To prevail on a breach-of-contract claim, a plaintiff must prove (1) a valid contract existed between the plaintiff and the defendant, (2) the plaintiff tendered performance or was excused from doing so, (3) the defendant breached the terms of the contract, and (4) the plaintiff sustained damages as a result of the defendant's breach. *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex.App.-Houston [14th Dist.] 2008, no pet.). In its motion for summary judgment, ConocoPhillips asserted the evidence conclusively negated the existence of a valid contract because the parties did not have a meeting of the minds; i.e. offer and acceptance.

■ Among other elements, a party must prove offer and acceptance to demonstrate existence of a valid contract. *De-Claire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex.App.-Houston [1st Dist.] 2008, no pet.); *Wal–Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 555–56 (Tex.App.-Houston [14th Dist.] 2002, no pet.). A "meeting of the minds" is "merely a mutuality subpart of the offer and acceptance elements." *Domingo v. Mitchell*, 257 S.W.3d 34, 40 (Tex.App.-Amarillo 2008, pet. denied). Although whether the parties intended to be bound is often a question of fact, it may be determined as a matter of law. *See Foreca, S.A. v. GRD*

*Devel. Co.*, 758 S.W.2d 744, 746 (Tex.1988); *John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 16 (Tex.App.-Houston [1st Dist.] 2000, pet. denied); *see also COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 662–70 (Tex.App.-Dallas 2004, pet. denied).

Although a PSA was never executed, WTG contends ConocoPhillips accepted WTG's offer during the December 11th phone conversation by representing that ConocoPhillips had decided to "go forward with" WTG, they had a "deal," ConocoPhillips had "immaterial" changes to WTG's PSA, and "the parties" would "proceed to get it signed."[8]

Based on the following provisions in the bid procedures, ConocoPhillips argues that these oral representations, if any, did not constitute acceptance of WTG's offer:

> A Proposal will only be deemed to be accepted upon the execution and delivery by ConocoPhillips of a[PSA].

> Until the [PSA(s) ] for this transaction is executed by ConocoPhillips and a purchaser, [ConocoPhillips] ... shall not have any obligations to any party with respect to the contemplated transaction, and following such execution and delivery, the only obligations of ConocoPhillips ... will be to the other party to the

S.W.3d 20, 29 (Tex.App.-Houston [14th Dist.] 2005, pet. denied); (2) WTG acquired the complementary facility, forfeited the other purchase opportunity, and pursued due diligence on SAOU *after* learning ConocoPhillips was considering another offer; and (3) evidence indicated WTG would have acquired the complementary facility regardless of whether it purchased SAOU.

8. ConocoPhillips seemed to dispute WTG's version of the phone conversation. In his deposition, Freeman added details, including ConocoPhillips's alleged reference to a "deal" and "immaterial" PSA changes, that had not been included in WTG's interrogatory re-

sponse describing the conversation. ConocoPhillips also disputed that any proposed changes were "immaterial." The other evidence relative to our contract-formation analysis is undisputed because it consists of the documents relative to the bid process and the parties' documented or undisputed communications before and after the phone conversation. Consistent with our standard of review, we will treat WTG's version of the phone conversation as correct solely for summary-judgment purposes because, as explained below, we nevertheless conclude there was no fact issue regarding contract formation.

[PSA(s) ], and only as set forth therein.[9]

In contrast, for two reasons, WTG contends these provisions did not conclusively negate acceptance of its offer: (1) the fact that the parties contemplated later execution of a PSA did not necessarily preclude their informal agreement from constituting a binding contract; and (2) a fact issue existed on whether ConocoPhillips modified or waived these provisions. The trial court seemed to conclude the above-cited provisions might otherwise have negated that ConocoPhillips orally accepted WTG's offer, but a fact issue existed on whether ConocoPhillips waived these procedures.

### 1. Bid Procedures Precluding Acceptance Absent Execution of a PSA

ConocoPhillips cites several cases to support its contention that the above-cited bid procedures negated any purported acceptance of WTG's offer, including *John Wood Group* and *COC Services.*

In *John Wood Group,* after negotiating the potential sale of certain assets, the parties signed a letter of intent containing the following provision:

15. *Binding Effect.* This Letter Agreement constitutes a summary of the principal terms and conditions of the understanding which has been reached regarding the sale of certain assets to Purchaser.... *It does not address all of the terms and conditions which the parties must agree upon to become binding and consummated.* The Purchaser, however, does intend to move forward with its due diligence and expects to expend considerable sums to review the Sellers' Business. In consideration therefor, the parties have agreed to make certain covenants of this letter binding upon the parties notwithstanding the fact that not all details of the

transactions have been agreed upon. *Accordingly, it is understood and agreed that this letter is an expression of the parties' mutual intent and is **not binding** upon them except for the provisions of [several numbered paragraphs].*

26 S.W.3d at 15 (emphasis added in original opinion). The seller refused to consummate the transaction because of disputes on certain matters and sold the assets to another company. *Id.* In the prospective buyer's subsequent suit, a jury found that the seller breached the letter agreement. *Id.* at 16. The court of appeals held this issue was improperly submitted to a jury and there was no contract as a matter of law because the parties unambiguously expressed their intent not to be bound by the letter agreement except for certain paragraphs. *See id.* at 16–20.

In *COC Services,* the parties signed a letter of intent with a form master franchise agreement attached. 150 S.W.3d at 660. The letter provided that, if the master franchise agreement were not signed by a certain date, the letter "will expire, *and neither of the undersigned shall have any further obligation or liability hereunder with respect to a potential master franchise or license for the development and operation of the Stores....*" *Id.* at 663 (emphasis added in original opinion). Relying primarily on this language, the court held that, as a matter of law, the parties did not intend to be bound by the master franchise agreement which was never completed and executed. *See id.* at 665–70.

WTG cites several cases to support its position that the fact the parties contemplated later execution of a written agreement did not necessarily preclude their

---

**9.** Although these provisions mention "execution and delivery" of a PSA, for ease of reference, we will refer to these steps collectively as "execution" of a PSA.

informal agreement from constituting a binding contract. For example, in *Foreca,* the parties initialed a handwritten document which included several terms concerning the sale of amusement-park rides and the language, "SUBJECT TO LEGAL DOCUMENTATION CONTRACT TO BE DRAFTED BY [SELLER'S ATTORNEY]." 758 S.W.2d at 744–45. Subsequently, the seller sued the prospective buyer for breach of contract after it refused to purchase the rides. *Id.* at 745. Relying on the above-quoted language, the buyer urged that no enforceable agreement was made. *Id.* The Texas Supreme Court held this language was not conclusive on intent to contract because a fact question existed on whether the contemplated formal writing was a condition precedent to contract formation or merely a memorial of an already enforceable contract. *Id.* at 745–46.

WTG also relies on *Murphy v. Seabarge, Ltd.,* 868 S.W.2d 929, 933 (Tex.App.-Houston [14th Dist.] 1994, writ denied), in which a "Memorandum of Understanding" between partners provided it was "not intended to be a binding contract" but an outline of proposals in the event the partnership filed bankruptcy and thus was subject to "preparation of appropriate documentation" and approval of the bankruptcy court. When the partnership sued one partner for taking management fees beyond those authorized by the memorandum, he relied on the foregoing provision to argue the memorandum was not an enforceable contract. *Id.* at 932–33. The court held that a fact issue existed on whether the parties intended to be bound by the memorandum. *Id.* at 933–34.

The *Foreca* and *Murphy* courts recited, and WTG also relies on, the following well-established general contract principles: (1) the fact that parties to an informal agreement contemplate a formal writing does

not necessarily prevent formation of a binding contract even if the formal writing is never drafted and executed; *see Scott v. Ingle Brothers Pacific, Inc.,* 489 S.W.2d 554, 556 (Tex.1972) (citing 17 Am.Jur.2d, Contracts § 28); and (2) parties may form a binding contract if they agree on material terms although they leave other terms open for later negotiation; *see id.* (quoting 1 Arthur Corbin, *Corbin on Contracts* § 28, at 93–95 (1963)); *see also Foreca,* 758 S.W.2d at 746 (citing *Scott,* 489 S.W.2d at 556); *Murphy,* 868 S.W.2d at 933 (citing *Scott,* 489 S.W.2d at 556).

■ We conclude that *John Wood Group* and *COC Services* are persuasive in the present case and *Foreca* and *Murphy,* as well as the general contract principles recited therein, are distinguishable. The ConocoPhillips bid procedures were much more definitive than the "subject to legal documentation" language in *Foreca.* Instead, like the pertinent provisions in *John Wood Group* and *COC Services,* the bid procedures unequivocally provided that ConocoPhillips did not intend to accept an offer, or bear any contractual obligations to another party, absent execution of a PSA. Thus, execution of a PSA was clearly a condition precedent to contract formation and not merely a memorialization of an existing contract. *See John Wood Group,* 26 S.W.3d at 16–19 (stating the "is not binding" language in the *John Wood Group* letter of intent was more definitive than the language in *Foreca* and compelled only the conclusion that the parties did not intend to be bound).

The language disavowing intent to be bound in *Murphy* was more emphatic than the pertinent language in *Foreca.* *See Murphy,* 868 S.W.2d at 933. Nevertheless, the evidence raising a fact issue was the partner's admitted partial performance of the agreement despite his later attempt to disavow an enforceable contract. *Id.* at

932–34; *see John Wood Group*, 26 S.W.3d at 17 (distinguishing *Murphy* because its party's partial performance after agreement was signed created fact question on intent to be bound despite "no intent" provision whereas no such partial performance occurred in *John Wood Group* ). In the present case, the parties did not engage in partial performance; indeed, this dispute arose because ConocoPhillips sold the facility to another party.

In fact, the *John Wood Group* court acknowledged the general principles recited in *Foreca*, *Murphy*, and *Scott* when cautioning that a party may risk being contractually bound by a letter of intent which includes essential terms although it does not contain all protections for which the parties would ordinarily negotiate or on which due diligence is incomplete. *See John Wood Group*, 26 S.W.3d at 19–20. "Therefore, a party who does not wish to be prematurely bound by a letter agreement should include 'a provision clearly stating that the letter is nonbinding, as such negations of liability have been held to be effective.'" *Id.* at 19 (quoting E. Allan Farnsworth, *Farnsworth On Contracts* § 3.8b, at 193 (1990)). The court stated that the case did not merely involve missing unessential terms, but whether there was mutual consent on essential terms. *Id.* at 20. Although the parties may have reached a preliminary agreement on essential terms—the item to be sold and the price—the seller withheld its consent to be bound on those agreed-upon terms until a final purchase agreement was signed. *Id.* Similarly, ConocoPhillips withheld its acceptance of an offer until execution of a PSA, despite any preliminary "deal" on essential terms made during the December 11th phone conversation.

We acknowledge that the present case differs from *John Wood Group* and *COC*

*Services* in that the provisions reflecting intent not to be bound in those cases were contained in a written agreement signed by both parties. *See John Wood Group*, 26 S.W.3d at 15; *COC Servs.*, 150 S.W.3d at 663. In this case, the language precluding acceptance of an offer absent execution of a PSA was contained within the bid procedures promulgated by ConocoPhillips. Nonetheless, WTG made its bid "[i]n accordance with the [CIM] ... and the [bid procedures]." WTG argued this language did not necessarily mean it agreed to the bid procedures, but merely that it was responding to the procedures by submitting all items required therein. Although the trial court ultimately agreed with WTG on the contract-formation dispute, it disagreed with this point, stating "it appears the procedures were incorporated into WTG's offer...."

█ We agree that, under the plain meaning of "[i]n accordance with," WTG submitted its offer subject to the bid procedures. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 12 (1993) (defining "accordance" to mean "Agreement, Accord"); BLACK'S LAW DICTIONARY 18 (8th ed.2004) (defining "accordant" to mean "In agreement"). Nevertheless, by acknowledging the bid procedures, WTG knew that ConocoPhillips, at least, had no intent to be bound absent execution of a PSA. *See* RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. B (1981) ("[I]f either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract."); *see also RHS Interests, Inc. v. 2727 Kirby Ltd.*, 994 S.W.2d 895, 897–99 (Tex.App.-Houston [1st. Dist.] 1999, no pet.) (holding there was no contract for purchase of

property where buyer stated its written offer was "not binding as an agreement unless and until a fully executed Earnest Money contract is signed," but even under buyer's position that subsequent oral negotiations replaced this offer, no contract was formed because *seller's* response indicated "deal" would be consummated only by "execution of the binding Purchase and Sale Agreement.").

### 2. Modification or Waiver of Bid Procedures

Next, WTG contends, and the trial court agreed, that the language at issue in the bid procedures did not conclusively negate acceptance of WTG's offer because a genuine issue of material fact existed on whether ConocoPhillips modified or waived the procedures. In support, WTG and the trial court cited another provision in the bid procedures:

> ConocoPhillips reserves the right, without explanation, to amend, modify or waive the procedures, terms and conditions set forth herein at any time, with or without sending notice of the waivers or changes to prospective purchasers.

Additionally, WTG argued, and the trial court stated, "Texas jurisprudence allows parties to orally modify a contract even if the contract itself contains language prohibiting oral modification, if parties agree to disregard this language." *See Morrison v. Ins. Co. of N. Am.,* 69 Tex. 353, 364, 6 S.W. 605, 609 (Tex.1887); *Mar–Lan Indus., Inc. v. Nelson,* 635 S.W.2d 853, 855 (Tex.App.-El Paso 1982, no writ).[10]

Relying on the above-cited provision and the general principle regarding contract modification, the trial court concluded:

> It is possible ConocoPhillips had the requisite intent to form a contract without the added protection of the bid procedures and, that though the parties still intended to execute a final agreement, ConocoPhillips forwent such as a requirement and accepted on the spot, thus waiving the condition precedent by its acceptance. Though the proposition that ConocoPhillips did so may seem dubious, this is a matter for the finder of fact to determine. Whether intent was present, acceptance given, and oral agreement made are matters best left to a finder of fact. The Court finds that the bid procedures promulgated by ConocoPhillips did not limit ConocoPhillips' ability to accept WTG's PSA as it was and at that time for the purposes of summary judgment.

WTG also cites authority recognizing a party may waive a condition it originally imposed as prerequisite to contract formation, although the trial court did not recite this principle in its order. *See, e.g., Padilla v. LaFrance,* 907 S.W.2d 454, 460–61 (Tex.1995) (recognizing offer prescribing time and manner of acceptance must ordinarily be complied with to create contract, but different method of acceptance may be effectual where offeror agrees to modification of terms of acceptance).

■ Waiver is "an intentional relinquishment of a known right or intentional

---

**10.** Despite ConocoPhillips's disagreement, the trial court suggested that this general principle regarding oral modification of an *existing* contract was applicable to a question of contract *formation*. *See W. Hatcheries v. Byrd,* 218 S.W.2d 342, 343 (Tex.Civ.App.-Dallas 1949, no writ) ("Power to modify a pre-existing contract is coextensive with the power to initiate it ...." (quoting 10 Tex. Jur. § 203)). ConocoPhillips also notes the full holding of *Mar–Lan Industries* referred to oral modification of "a written contract *not required by law to be in writing.*" 635 S.W.2d at 855 (emphasis added). We need not decide the extent to which a written contract may be modified by oral agreement or whether principles regarding contract modification are applicable here because there is no fact issue on whether ConocoPhillips waived the bid procedures.

conduct inconsistent with claiming that right." *Jernigan v. Langley,* 111 S.W.3d 153, 156 (Tex.2003) (per curiam). Initially, Freeman acknowledged in his deposition that ConocoPhillips never expressed to WTG it had waived the bid procedures that precluded acceptance of an offer absent execution of a PSA. Nonetheless, the fact that ConocoPhillips did not communicate any express waiver to WTG is inconclusive because ConocoPhillips reserved the right to unilaterally waive the procedures without informing WTG. However, WTG also cites no evidence indicating ConocoPhillips made any express, internal decision to waive these procedures.[11] Therefore, the gist of WTG's argument, and the trial court's reasoning, was that a jury might decide the oral representations during the December 11th phone conversation themselves constituted ConocoPhillips's waiver of these bid procedures.

 Consequently, we construe the issue as whether ConocoPhillips waived the bid procedures through its conduct; i.e. representations which did not expressly relinquish its rights. For implied waiver to be found through a party's conduct, intent must be clearly demonstrated by the surrounding facts and circumstances. *Id.; see Van Indep. Sch. Dist. v. McCarty,* 165 S.W.3d 351, 353 (Tex.2005) ("[T]hat conduct must be unequivocally inconsistent with claiming a known right."). "There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right." *Jernigan,* 111 S.W.3d at 156. Waiver is ordinarily a question of fact, but when the surrounding facts and circumstances are undisputed, the question becomes one of law. *Id.* at 156–57. Considering the surrounding facts and circumstances, including the purpose of the bid process and procedures and ConocoPhillips's actions after the phone conversation, we conclude the oral representations were insufficient as a matter of law to constitute waiver of the bid procedures at issue.

### a. The purpose of the bid process and procedures

 First, allowing a jury to decide the oral representations alone constituted waiver would vitiate the purpose of the overall bid process and the procedures. The bid procedures provided that one of ConocoPhillips's "key objectives" was "to obtain the highest possible value" and it would evaluate proposals "with the goal of negotiating and executing a [PSA(s) ] with the party that submits the Proposal which best meets [ConocoPhillips's] objectives." ConocoPhillips's internal e-mails reflect that the "highest possible value" involved considerations of purchase price and contract terms.

Both the CIM and the bid procedures demonstrate they were intended to ensure that ConocoPhillips achieved its objectives by prescribing an aggressive, competitive

---

**11.** Garrett Rychlik, ConocoPhillips's representative who actually participated in the December 11th phone conversation and was deposed as ConocoPhillips's corporate representative, expressly testified it did not "change those procedures." However, in a letter filed before the summary-judgment hearing regarding the parties' agreements relative to evidentiary objections, ConocoPhillips's counsel wrote, "Defendants are willing to limit their reliance on depositions attached as exhibits to their briefs to the spe-

cific pages of those exhibits cited within those briefs." Rychlik's entire deposition was attached to ConocoPhillips's motion for summary judgment, but the above excerpt was not cited in ConocoPhillips's summary-judgment filings. We note the trial court did not specifically strike all deposition testimony that was not cited in the parties' briefs. Nonetheless, even if we disregard the above excerpt, WTG failed to present any evidence that ConocoPhillips expressly decided to waive the bid procedures.

bidding process. ConocoPhillips reserved the right to pursue the most favorable bid until execution of a PSA by specifying it could entertain a bid at any time, negotiate with any prospective purchaser at any time, and negotiate with multiple parties at the same time.

▇▇▇ Additionally, arriving at the final terms of a complex, commercial transaction involves extensive time, effort, research, and finances. *See John Wood Group*, 26 S.W.3d at 19. Further, it is axiomatic that parties to a complex transaction may need to reach a preliminary agreement in order to proceed toward execution of a final agreement. Consequently, parties may structure their negotiations so that they preliminarily agree on certain terms, yet protect themselves from being prematurely bound in the event they disagree on other terms. *See id.* (discussing purpose of a letter of intent). Indeed, the CIM reflected that ConocoPhillips viewed a preliminary agreement as different from a PSA because it reserved the right to "enter into preliminary or definitive agreements at any time." Thus, entering into a preliminary "deal" was not necessarily inconsistent with requiring an executed PSA to form a binding contract.[12]

Accordingly, the bid procedures at issue were intended in part to protect ConocoPhillips in a situation such as the present dispute; i.e. prevent an informal, preliminary agreement with a prospective purchaser from forming a binding contract before execution of the formal writing. Consequently, we employ an opposite rea-

soning to that urged by WTG and adopted by the trial court: in short, the representations during the December 11th phone conversation cannot alone constitute waiver of the bid procedures and acceptance of WTG's offer when the bid procedures were implemented partly to prevent such representations from constituting acceptance of an offer.

Again, we find *COC Services,* as well as a federal case cited therein, are illustrative. In *COC Services,* the plaintiff buyer argued that the following conduct by the seller after signing the letter of intent indicated the parties had entered into a contract although no master franchise agreement was ever signed: the seller sent potential licensees materials indicating the master franchise agreement was already binding; the seller acquiesced in materials the buyer prepared for potential licensees stating that it "currently owns" a franchise; and the seller's representative stated in a meeting that the partners of the buyer were "owners of right for the franchise." *COC Servs.,* 150 S.W.3d at 669. The court held that the seller's conduct did not eclipse the other factors showing lack of intent to be bound absent execution of a master franchise agreement. *Id.* at 669–70.

The *COC Services* court cited *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72–73 (2nd Cir.1989), in which the court concluded that the parties to a memorandum "agreement" concerning the sale of certain assets did not intend to be bound until execution of a formal agree-

---

12. ConocoPhillips did not sign a PSA with WTG because it received a better offer—not because the parties failed to agree on additional terms. Nonetheless, ConocoPhillips reserved the right to condition its acceptance on an executed PSA regardless of the reason it might never be executed. Further, as the trial court suggested relative to the statute-of-frauds analysis, despite ConocoPhillips's pur-

ported representations to Freeman on December 11 that its revisions to WTG's PSA were immaterial, it is unknown whether they truly would have been immaterial once negotiated. As the trial court further recognized, if WTG were unwilling to sign an agreement incorporating ConocoPhillips's revisions, WTG would likely have been the party claiming ConocoPhillips never accepted WTG's offer.

ment. The court reached this conclusion although the seller, who ultimately refused to consummate the transaction and disavowed existence of a binding contract, engaged in the following conduct after signing the memorandum agreement: obtained its board's approval of the "proposed agreement"; informed third-parties of an "agreed-upon" sale with a "signed agreement"; referred to the buyer as the "new owner"; took various steps to consummate the transaction; and referred to on-going "final" negotiations with an absolute closing date. *See id.* at 71.

We recognize the *COC Services* and *Arcadian* courts did not use the term "waiver." *See generally COC Servs.,* 150 S.W.3d 654; *Arcadian,* 884 F.2d 69. Nevertheless, their discussions were similar to a waiver analysis because the courts refused to disregard the parties' expression of no intent to be bound by a preliminary agreement despite one party's subsequent conduct which might otherwise have shown acknowledgment of a binding contract. *See COC Servs.,* 150 S.W.3d at 669–70; *Arcadian,* 884 F.2d at 71–73. Likewise, ConocoPhillips's representations of a "deal" and promise to negotiate and sign a PSA did not eclipse the bid procedures precluding its acceptance of an offer until execution of the PSA.[13]

b. **ConocoPhillips's actions after the December 11th representations**

Additionally, ConocoPhillips's subsequent actions were insufficient to raise a fact issue on whether the December 11th oral representations constituted waiver of the bid procedures and acceptance of WTG's offer. To the contrary, ConocoPhillips's subsequent actions negated that it had waived the procedures and accepted WTG's offer.

In the trial court, WTG emphasized the following statements in the internal e-mails generated by ConocoPhillips in the days immediately after the December 11th conversation, discussing the decision to proceed with WTG for SAOU, as opposed to a package sale to Targa: "We are committed to obtain the best value as well as live with our deals"; and "Certainly Targa is a great option if those deals fall apart." Even if these references to "deals" all meant an agreement with WTG, we employ the same reasoning relative to the e-mails as to the representations in the phone conversation regarding a "deal."[14] The e-mails indeed indicated ConocoPhillips had decided at that point to reach a preliminary agreement and continue negotiations with only WTG for SAOU. However, they were not unequivocally inconsistent with ConocoPhillips's reserving the right to insist on execution of a PSA as prerequisite to forming a *definitive* agreement.

Rather, these e-mails reflected ConocoPhillips's view that it had not yet formed a

13. We do not necessarily agree that the language in the *Arcadian* memorandum agreement negating contract formation would do so under Texas law. Regardless, we do not cite *Arcadian* relative to the language sufficient to negate intent to be bound absent a final agreement. Rather, we cite *Arcadian* for the proposition that the seller's conduct after signing the memorandum agreement was insufficient to override language that at least the *Arcadian* court considered sufficient to negate intent to be bound.

14. Relative to the statute-of-frauds issue, the trial court concluded "We are committed to ... live with our deals" did not clearly mean an agreement with WTG, as opposed to some other agreement or general "sentiment." We will assume solely for purposes of the contract-formation issue that this statement referred to a preliminary agreement with WTG because it nonetheless did not raise a fact issue on waiver.

binding contract, particularly the references to:

- "starting down the road" with WTG;
- "moving forward with due diligence and PSA negotiations";
- "going down the path" of a sale to WTG;
- being "more confident" of closing with WTG;
- anticipating little risk WTG would "whittle the price down"; and
- considering Targa as an option if "negotiations" and a "deal[s]" with WTG should "fall apart."

Significantly, ConocoPhillips would not have needed to express even the slightest concern that WTG might "whittle the price down" or the deal could "fall apart" if it believed the parties had already formed a contract for the amount of WTG's final bid.

WTG also relied on the December 22nd e-mail from Engle (Morgan Stanley) to WTG authorizing it to proceed with due diligence and stating, "we believe the two parties are close enough on the PSA that finalizing that document can be done in an expedious [sic] fashion (most likely during the week of Jan. 5)." Contrary to WTG's suggestion, this statement did not show that ConocoPhillips had accepted WTG's offer and viewed signing a PSA as merely a ceremonial step remaining in the process. In his deposition, Engle explained that "finalizing" meant:

> "[T]he two parties would come together ... and we were always talking about scheduling aside two or three full days to negotiate the outstanding terms of the PSA, but ... who knows when you get the lawyers in the room negotiating these things, how long that could take,

... but there were still at least several days away of negotiation from signing the PSA.... After having negotiated all of the points, finalizing is when the two sides sign the PSA."

Therefore, the Engle e-mail indicated, at most, that ConocoPhillips intended to engage in negotiating a PSA, which could then be signed by the parties, although this process never materialized. Again, the e-mail was insufficient to show that ConocoPhillips had relinquished its right to withhold its acceptance until the PSA was actually signed.

In fact, the following communications of ConocoPhillips and Morgan Stanley to WTG during late December 2003 and January and February of 2004 negate that ConocoPhillips had waived the bid procedures and accepted WTG bid before execution of a PSA:

- informing WTG that ConocoPhillips was considering another offer several days before the above-referenced December 22nd e-mail from Engle to WTG;
- confirming this fact to WTG on the same day Engle sent the above-referenced e-mail;
- periodically advising WTG regarding the status of negotiations with the other party;
- reminding WTG that ConocoPhillips was allowed to negotiate with another party at any time pursuant to the bid procedures;
- telling WTG it was free to submit a revised bid; and
- referring to WTG as a "good alternative." [15]

---

**15.** WTG's post-December 11th communications were somewhat inconsistent regarding whether it believed ConocoPhillips had accepted WTG's offer. On one hand, Freeman's asking if WTG would be given the opportunity to submit a revised bid and urging ConocoPhillips to "negotiate" and "finalize"—not just "sign"—a PSA indicated WTG did not

Finally, we acknowledge the bid procedures were one-sided in ConocoPhillips's favor. In fact, they also provided that ConocoPhillips's "interpretation of the [bid procedures] shall be final and binding on all parties submitting a Proposal." In its summary-judgment response, WTG asserted that ConocoPhillips "attempt[s] to have everything its way, and to give itself free reign to do whatever it pleases, regardless of what it has said...." We also acknowledge that, under our reasoning, it would be difficult for WTG to raise a fact issue on waiver short of an express statement of waiver by ConocoPhillips, whether communicated to WTG or formulated internally, or its engaging in partial performance of the contract. Regardless, WTG chose to participate in the process knowing ConocoPhillips precluded its acceptance of a bid, and essentially reserved the right to change its mind, before execution of a PSA.

In sum, ConocoPhillips proved as a matter of law there was no meeting of the minds necessary to form a binding contract because it did not accept WTG's offer. Accordingly, we sustain ConocoPhillips's cross-point and uphold the summary judgment in its favor.

## IV. TARGA'S MOTION FOR SUMMARY JUDGMENT

In its second issue, WTG contends the trial court erred by granting summary judgment on its cause of action against Targa for tortious interference with contract.[16]

■■■ The elements of tortious interference with contract are (1) existence of a contract subject to interference, (2) willful and intentional interference, (3) interference that proximately caused damage, and (4) actual damage or loss. *Powell Indus., Inc. v. Allen,* 985 S.W.2d 455, 456 (Tex. 1998). In essence, WTG asserts Targa knew, or should have known, about the alleged oral contract between WTG and ConocoPhillips and intentionally interfered by subsequently making a higher offer.

■■■ Targa moved for summary judgment on the following grounds: (1) WTG's claim fails because there was no valid contract between ConocoPhillips and WTG; and (2) WTG cannot prove Targa knew, or should have known, about any contract between WTG and ConocoPhillips and, thus, cannot establish intentional interference. Targa contends it was simply the highest bidder in a competitive auction process that allowed ConocoPhillips to consider any bid, and negotiate with any party, before execution of a PSA.

In its order, the trial court stated that it granted summary judgment in favor of Targa on the tortious-interference claim because "[t]he Court has found that no contract existed between WTG and ConocoPhillips." However, as we have dis-

view the parties as already having a binding contract for the amount of its final bid. Further, WTG cites no portion of the record reflecting that Freeman insisted ConocoPhillips cease negotiations with the other party because WTG and ConocoPhillips already had a contract. On the other hand, Davis's letters, stating the parties had an "agreement" on price and WTG had been "selected" to purchase SAOU and urging ConocoPhillips to "honor its commitment to accept our bid," arguably support that WTG did view the parties as already having a contract. Regardless

of WTG's beliefs, the issue is whether *ConocoPhillips* waived the pertinent bid procedures because it reserved the right to *unilaterally* change the procedures and was the only party who could do so.

16. The record reflects WTG conceded in the trial court that summary judgment was appropriate on its claim for tortious interference with business relationship and, on appeal, WTG does not challenge summary judgment on this claim.

cussed, the trial court actually found a fact issue on existence of a contract but ruled any such contract was unenforceable under the statute of frauds. Therefore, the trial court implicitly denied summary judgment in Targa's favor on the ground there was no contract. We construe the trial court's ruling on Targa's motion as concluding the tortious-interference claim failed because there was no *enforceable* contract under the statute of frauds. The trial court also analyzed Targa's alternate summary-judgment ground "[i]n the interests of completeness." In essence, the court found that Targa, when submitting the December 15th bid, did not know, and had no duty to inquire whether, ConocoPhillips had entered into a contract with another party for sale of the assets and could not be liable for simply making a superior offer.

On appeal, WTG challenges both rulings. Targa presents a cross-point challenging the trial court's conclusion that a genuine issue of material fact existed on whether WTG and ConocoPhillips entered into a contract. Because we have concluded there was no contract, we agree that, as a matter of law, Targa is not liable for tortious interference. Therefore, we sustain Targa's cross-point and uphold the summary judgment in its favor.

We affirm the trial court's final judgment in its entirety.