# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 12, 2012

Lyle W. Cayce
Clerk

No. 11-41003

RICHARD C. COE; BARBARA ANNE COE; DOUGLAS COE, JR.; PEAK ENERGY CORPORATION,

Plaintiffs – Appellees

v.

CHESAPEAKE EXPLORATION, L.L.C.; CHESAPEAKE ENERGY CORPORATION,

Defendants – Appellants

Appeal from the United States District Court
for the Eastern District of Texas

Before JOLLY, HIGGINBOTHAM, and DENNIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In July 2008 Chesapeake Exploration, LLC entered into an agreement to purchase deep rights held by Peak Energy Corporation in certain oil and gas leases in the Haynesville Shale formation, for the hefty sum of $15,000 per acre. When the price of natural gas plummeted several months later, Chesapeake refused to honor its commitment. In response to the complaint filed by Peak it contended that the parties' agreement was unenforceable under the Texas statute of frauds, fatally indefinite, and that the plaintiffs had failed to tender performance. The district court disagreed, rendering judgment in favor of Peak and its principals and awarding them damages in the amount of $19,951,004,

No. 11-41003

pre-judgment and post-judgment interest, and attorneys' fees and costs. Finding no error, we affirm.

## I.

The Haynesville Shale is a stratographic rock formation in east Texas, northwest Louisiana and southwest Arkansas that lies beneath the Cotton Valley formation and contains large quantities of natural gas. In 2008, when natural gas prices were soaring, Chesapeake[1] attempted to acquire as much producing acreage as it could. To that end it engaged the services of Texas oil man Greg Wood who, with the help of Steve Howell of Howell Oil and Gas, identified Peak Energy Corporation[2] as an owner of mineral rights in the area. Based on information that Wood obtained from Howell, Chesapeake created detailed maps of Peak's potential holdings.

On June 30, 2008 Wood initiated contact with Richard Coe at Peak. He told Coe that Chesapeake was interested in acquiring all of the deep rights that Peak owned in the Haynesville Shale, and that it was his understanding that Peak had rights in 5,404.75 acres in Harrison County, Texas, where part of the Haynesville Shale is located. Coe stated he did not know how many acres Peak had in the area. Based on this conversation, Wood informed Chesapeake that Peak might be willing to sell its holdings for $15,000 per acre for a net revenue interest of 75%. Chesapeake CEO Aubrey McClendon instructed Wood to "make the deal for us," and on July 1 Wood and Coe reached an oral agreement.

---

[1] Defendant-appellant Chesapeake Exploration, LLC is an Oklahoma limited liability corporation and a subsidiary of defendant-appellant Chesapeake Energy Corporation, a publicly traded Oklahoma corporation. We refer to them collectively as "Chesapeake."

[2] Plaintiff-appellee Peak Energy Corporation ("Peak") is a Texas corporation. Plaintiffs-appellees Richard Coe, Barbara Anne Coe and Douglas Coe, Jr., are officers of Peak.

No. 11-41003

On July 2, 2008 Douglas Jacobson, Chesapeake's executive vice president, e-mailed a letter entitled "Offer to Purchase" to Coe that stated:[3]

> Chesapeake Exploration, L.L.C. ("Chesapeake") hereby submits a cash offer of Eighty One Million Seventy One Thousand Two Hundred Fifty and No/100ths Dollars ($81,071,250.00) ("Purchase Price") to Peak Energy Corporation ("Seller"), effective July 2, 2008 (the "Effective Date"), for all the Seller's right, title and interest in certain oil and gas leases located in Harrison County, Texas (and only those located in Harrison County, Texas), such leases being shown in the map attached hereto as Exhibit "A", excepting and reserving unto the Seller all right, title and interest in and to the formations, intervals, strata and depths found between from the surface of the Earth and the stratigraphic equivalent of the base of Cotton Valley formation and further reserving an overriding royalty interest described below (the "Leases").

The "terms and conditions" section specified that "[t]he leases to be conveyed...shall include approximately 5,404.75 net acres," and "[a]djustments to the Purchase Price based on the Seller delivering more or less than 5,404.75 net acres shall be made in accordance with the allocated value of $15,000 per net acre." It further provided that "[t]his offer will be considered void if not accepted by 5:00 PM CDT on July 3, 2008," was a "valid and binding agreement," and that the transaction's closing date was August 31, 2008. At Coe's request, an asterix was added after "Peak Energy Corporation" to indicate that "Seller" included "affiliated entities for which Peak Energy Corporation or its officers have the authority to act as agent or principal." Attached to the letter was Exhibit A, a letter-sized map showing Harrison County and parts of neighboring counties. Several areas in Harrison County were highlighted and had "PEAK" written

---

[3] We refer to this letter as the "July Agreement."

3

next to them.  Jacobson and Coe signed the letter on behalf of Chesapeake and Peak, respectively.

Three weeks after the July Agreement had been signed, Chesapeake asked Peak to prepare a final list of leases to be conveyed.  "Prior to that date," the district court found, "Chesapeake had relied exclusively on its own due diligence to determine what leases were subjected to the parties' agreement."  As they worked to complete the lease list and other closing documents, both parties requested and obtained extensions beyond the original closing date.  Chesapeake repeatedly expressed its intent to complete the transaction and Peak, believing itself bound by the July Agreement, did not solicit or entertain any offers for its holdings in Harrison County.

On October 9, Chesapeake requested that closing be postponed until January 2009.  Six days later, it informed Coe that it would not be completing the transaction.  Michael Falen, Chesapeake's supervisor of acquisitions, told Coe there were "timing issues" and that the properties were "edgy."  This decision coincided with a significant decrease in natural gas prices that had begun in August 2008.  By October, these prices had fallen approximately 50% from their high in early July, and the fair market value of deep right leases in Harrison County had decreased to $3,000 per acre.

Peak and the Coes filed suit to enforce the agreement in September 2009. Chesapeake insisted the July Agreement was simply an agreement to negotiate, or letter of intent, and not binding.  It claimed the agreement did not meet the requirements of the Texas statute of frauds and was too indefinite to be enforced. The district court held a bench trial in September 2010.  In November, it appointed retired oil and gas attorney William Huffman as an expert,[4] and asked him: "Reviewing only the Partial Findings of Facts, the furnished exhibits, and

---

[4] Chesapeake made a timely but unsuccessful objection to the appointment.

## No. 11-41003

an unlimited review of the Deed and Property Records of Harrison County...could he identify by reference to the volume and page number of said deed records the oil and gas leases contained within the shaded areas of the Map wherein Peak Energy Corporation is named as the lessee?" Huffman testified that he could, but emphasized that "without reviewing the real property records in the office of the County Clerk of Harrison County he would not be able to identify the leases in the name of Peak." He also concluded he could determine whether a lease contained a depth limitation by reading the lease or, if the lease included a depth severance provision, by looking at additional public records such as those of the Texas Railroad Commission.

The district court ruled the July Agreement was enforceable and entered judgment in favor of Peak in September 2011. It awarded damages to Peak in the amount of $19,751,004, as well as pre-judgment and post-judgment interest.[5] Peak also received $434,951.80 in attorneys' fees and $19,851.92 in costs. Execution of the judgment was stayed pending this appeal.

## II.

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo."[6] Because this case came before the district court on diversity jurisdiction, we apply the substantive law of Texas.[7] In "making an *Erie*-guess in the absence

---

[5] This amount was reached by multiplying the number of acres subject to the agreement (1,645.917) by $12,000, which was the contract price ($15,000 per acre) minus the market price on the date of breach ($3,000 per acre).

[6] *Preston Exploration Co., L.P. v. GSF, L.L.C.*, 669 F.3d 518, 522 (5th Cir. 2012) (quoting *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000)).

[7] *Id.* (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78-79 (1938)).

No. 11-41003

of explicit guidance from the state courts, we must attempt to predict state law, not to create or modify it."[8]

### III.

Chesapeake's first argues that the parties' July Agreement is unenforceable under the Texas statute of frauds because it does not adequately identify the property to be conveyed. "To satisfy the Statute of Frauds, a contract [conveying an interest in land] must furnish within itself, or by reference to some other existing writing, the means or data by which the property to be conveyed may be identified with reasonable certainty."[9] The description must be contained in the written agreement and written instruments to which it refers, as "the knowledge and intent of the parties will not give validity to the contract, and neither will a plat made from extrinsic evidence."[10] A map referenced in the agreement may be used to aid a defective description so long as it "contains enough descriptive information which, when considered

---

[8] *Am. Waste & Pollution Control Co. v. Browning-Ferris, Inc.*, 949 F.2d 1384, 1386 (5th Cir. 1991) (internal quotation marks and citation omitted); *see also Cerda v. 2004-EQR1 L.L.C.*, 612 F.3d 781, 794 (5th Cir. 2010) ("In making an *Erie* guess, we defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the higher court of the state would decide otherwise.") (quoting *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GmbH*, 524 F.3d 676, 678 (5th Cir. 2008)).

[9] *Long Trusts v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006) (internal quotation marks and modifications omitted) (citing *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972)); *see also* TEX. BUS. & COM. CODE § 26.01(a) ("A promise or agreement...is not enforceable unless the promise or agreement, or a memorandum of it, is (1) in writing; and (2) signed by the person to be charged...."); *id.* at § 26.01(b)(4) ("Subsection (a) of this section applies to...a contract for the sale of real estate"); *Fears v. Texas Bank*, 247 S.W.3d 729, 736 (Tex. App.–Texarkana 2008) ("If enough appears in the description so that a person familiar with the area can locate the premises with reasonable certainty, it is sufficient to satisfy the statute of frauds.").

[10] *Morrow*, 477 S.W.2d at 540 (internal citations omitted).

No. 11-41003

in connection with the attempted written description...make[s] location of the land possible."[11]

If the agreement contains a sufficient nucleus of description, then "parol evidence may be introduced to explain the descriptive words in order to locate the [property]."[12]  "Extrinsic evidence may be used only for the purpose of identifying the property with reasonable certainty from the data contained in the contract," however, and "not for the purpose of supplying the location or description of the property."[13] As the Texas Supreme Court explained in *Wilson v. Fisher*, "[t]he details which merely explain or clarify the essential terms appearing in the instrument may ordinarily be shown by parol.  But the parol must not constitute the framework or skeleton of the agreement.  That must be contained in the writing.[14]

As we explained above, the July Agreement stated:

> Chesapeake Exploration, L.L.C. ("Chesapeake") hereby submits a cash offer of [$81,071,250.00]...to Peak Energy Corporation ("Seller")...for all the Seller's right, title and interest in certain oil and gas leases located in Harrison County, Texas (and only those located in Harrison County, Texas), such leases being shown in the map attached hereto as Exhibit "A", excepting and reserving unto the Seller all right, title and interest in and to the formations, intervals, strata and depths found between from the surface of the Earth and the

---

[11] *River Road Neighborhood Ass'n v. South Texas Sports*, 720 S.W.2d 551, 558 (Tex. App.–San Antonio 1986, writ dism'd); *see also U.S. Enters., Inc. v. Dauley*, 535 S.W.2d 623, 628 (Tex. 1976); *Dunlap-Swain Tire Co. v. Simons*, 450 S.W.2d 378, 381 (Tex. Civ. App.–Dallas 1970, writ ref'd n.r.e.).

[12] *Gaut v. Daniel*, 293 S.W.3d 764, 767 (Tex. App.–San Antonio 2009) (citing *Gates v. Asher*, 280 S.W.2d 247, 248 (1955)).

[13] *Long Trusts*, 222 S.W.3d at 416 (internal quotation marks and modifications omitted) (citing *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983)).

[14] 188 S.W.2d 150, 152 (1945).

No. 11-41003

> stratigraphic equivalent of the base of Cotton Valley
> formation and further reserving an overriding royalty
> interest described below (the "Leases").

The asterix following Peak indicated that "Seller" "includ[es] affiliated entities for which Peak Energy Corporation or its officers have the authority to act as agent or principal." The letter explained in its "terms and conditions" section that "[t]he Leases to be conveyed to Chesapeake by the Seller shall include approximately 5,404.75 net acres and each Lease shall be delivered at a net revenue interest of not less than seventy-five percent (75%). The Leases shall cover all depths, intervals and formations below the stratigraphic equivalent of the base of the Cotton Valley formation." Attached to the letter as Exhibit A was a letter-sized map showing Harrison County and parts of adjacent counties. Several portions of the map were shaded, with "PEAK" written next to them.

At trial the district court determined that Exhibit A was a printout of a computer file, admitted as Exhibit 52A. Also admitted into evidence was Exhibit 52B, an enlarged version of Exhibit A. The district court found the map had been generated by Chesapeake using GIS-enabled computerized mapping software. At different layers, the district court explained, the map "shows county lines, city lines, water boundary lines, and the location of specific gas units," "accurately depicts the location of surface owners within the county," and "ha[s] embedded within it the GPS coordinates for each specific location and boundary line depicted on the map." The court also found that "[t]he Map includes names of surveys and their corresponding abstract numbers...[which] are legible [on Exhibit 52B] and identify the original grants from the State of Texas in Harrison County." Chesapeake created the map using information that Wood obtained from Howell, and relied on this information when concluding that Peak had mineral rights in 5,404.75 net acres of land in Harrison County, an

8

No. 11-41003

estimation that did not account for the particular depths at which Peak held its rights.

Chesapeake contends that the July Agreement does not provide a sufficient nucleus of description to satisfy the statute of frauds. It points out that the leases subject to conveyance under the agreement are identified only as "certain oil and gas leases" located in the shaded areas of Exhibit A. Texas courts have repeatedly warned that "a deed purporting to convey land, which describes it only by quantity and as being part of a larger tract, with nothing whereby to identify what specific portion of the larger tract is intended to be conveyed, is void for uncertainty of description."[15] Because that is precisely what the July Agreement does, Chesapeake argues, the district court erred in finding it enforceable.

Unfortunately, no Texas court has yet interpreted the exact language used in the July Agreement.[16] We conclude, however, that this agreement is enforceable under the statute of frauds. A central purpose of the statute of frauds's "reasonable certainty" requirement is to avoid instances in which a

---

[15] *Smith v. Sorelle*, 87 S.W.2d 703, 705 (Tex. 1935); *see also Long Trusts*, 222 S.W.3d at 416; *Morrow*, 477 S.W.2d at 540-41; *Williams v. Ellison*, 493 S.W.2d 734, 737 (Tex. 1973).

[16] Chesapeake directs us to *Cheetah Gas Co. v. Chesapeake Louisiana*, No. H-08-3237, 2009 WL 416324 (S.D. Tex. Feb. 19, 2009), in which the district court determined that a similar agreement failed under the statute of frauds. In that case, however, the referenced descriptive document, also called Exhibit A, was not attached to the agreement, leading the court to conclude that "[i]t is impossible from the Agreements to determine how and to what extent the more specific description in the missing Exhibit A limits or alters the description of the property to be assigned." *Id.* at *2-3. This distinguishes *Cheetah* from the case before us; there is no dispute that the map entitled Exhibit A was properly attached to the July Agreement. Chesapeake also points to the last paragraph of the *Cheetah* opinion, in which the court observed that the "all my property" line of cases did not apply to the Agreements because the Agreements only "provide that Cheetah will assign its interests in certain properties specifically described in the missing Exhibit A." *Id.* at *3. While this statement is informative, it does not appear to have been necessary to the court's holding. Furthermore, we note that this court is not bound to follow the district court's interpretation of state law.

court enforces the sale of property that the seller did not intend to convey, or that the buyer did not intend to purchase, based on an unclear contract. This level of certainty does not require that the agreement identify the property to be conveyed by metes and bounds.[17] Rather, state courts have acknowledged that other means of identification may suffice to achieve "reasonable certainty."

One method of identification that may provide a sufficient "nucleus of description" under the statute of frauds is a "recital of ownership." This is a means of identifying the property to be conveyed by identifying the person who owns the property, and is usually indicated by "such words as 'my property,' 'my land,' or 'owned by me.'"[18] As the Texas Supreme Court explained in *Kmiec v. Reagan*, "[w]hen the grantor is stated to be the owner of the property to be conveyed and it is proved that the grantor owns only a single tract answering the description, the land is identified with reasonable certainty."[19] Texas courts have extended this rule to agreements in which the grantor conveys all of his property in a specified area, even if such property includes several different lots,[20] and to the conveyance of multiple gas leases.[21] Because such a recital of

---

[17] *See Texas Builders v. Keller*, 928 S.W.2d 479, 481 (Tex. 1996) ("A writing need not contain a metes and bounds property description to be enforceable; however, it must furnish the data to identify the property with reasonable certainty.").

[18] *Kmiec v. Reagan*, 556 S.W.2d 567, 569 (Tex. 1977); *see also AIC Mgmt. v. Crewes*, 246 S.W.3d 640, 648 (Tex. 2008); *Pickett v. Bishop*, 223 S.W.2d 222, 223 (Tex. 1949).

[19] 556 S.W.2d at 569.

[20] *See, e.g.*, *Sanderson v. Sanderson*, 109 S.W.2d 744, 747 (Tex. Com. App. 1937) (holding that "[t]he description of the [property to be conveyed] as all lots now owned by Mrs. Kepton in Knox City is sufficient, for it leads to the certain identification of the property"); *Ragsdale v. Mays*, 65 Tex. 255, at *1 (Tex. 1885) (description was adequate where it identified the property to be conveyed as "[m]y interest in my lands in Lavaca county and also that in Uvalde County").

[21] *See, e.g.*, *In re Cornerstone E&P Co., LP*, 436 B.R. 830, 843, 844-45 (Bkrtcy. N.D. Tex. 2010) (explaining that "[s]pecifically in the context of oil and gas leases, under Texas law, a grant of all of a transferor's interests located within a clearly defined area, such as a named

No. 11-41003

ownership eliminates the risk of the property being misidentified, so long as the owner is conveying *all* of the property that he owns in the area described by the agreement, it fulfills the demands of the statute of frauds.

The July Agreement conveys all of Peak's rights, interest and title in oil and gas leases in the areas shown on Exhibit A, which outlined several tracts of land in Harrison County.[22]  This description is similar to other agreements enforced by Texas courts in which an owner conveyed all the property he owned in a specified state, county or survey.  The July Agreement also provides that the "certain" leases subject to conveyance are only those which include "depths, intervals and formations below the...Cotton Valley formation."  This provision essentially acts as a second geographic limitation further narrowing the areas covered by the agreement.  Because the property description contained in the July Agreement achieves the same "reasonable certainty" found in other "recital of ownership" cases, we conclude that the Agreement contains an adequate nucleus of description under the statute of frauds.[23]

Since the Agreement contains an adequate nucleus of description, we also reject Chesapeake's argument that the district court erred by instructing its

---

state or county, is sufficiently descriptive to effect a conveyance and thus satisfy the Statute of Frauds," and concluding the statute of frauds was met in this case because the instrument of conveyance granted an interest in "all rights, titles and interests [of transferor], both then owned and after-acquired, 'which are located on or under or which concern any Property or Properties referenced in Exhibit A,'" a document that listed several county names); *Texas Consolidated Oils v. Bartels*, 270 S.W.2d 708, 712 (Tex. Civ. App. 1954) (concluding the statute of frauds was met where the agreement conveyed all of the grantor's rights, title and interest in "[a]ll the oil, gas and mining leases, royalties and overriding loyalties located anywhere within the United States, any of which are located within the states of New Mexico, Kansas, Oklahoma, Louisiana and Texas.").

[22] We find no support for Chesapeake's claim that the district court could not consult Exhibits 52A and 52B, which were identical in all but size to Exhibit A, in reaching its judgment.

[23] The same argument applies to the contract's specification that the "certain" leases include only those with a 75% net revenue interest.

11

expert to review public records when determining whether the leases to be conveyed by the July Agreement could be identified. The Texas Supreme Court has repeatedly stated that an unlimited review of public records cannot be used to cure an otherwise deficient property description.[24] In cases where the agreement contains an adequate nucleus of description, however, Texas courts do allow extrinsic evidence to be used to "identify[] the property...from the data contained in the contract."[25] The district court therefore did not err in its instructions to its expert, or in holding that the July Agreement is enforceable under the Texas statute of frauds.

## IV.

Chesapeake next argues that the July Agreement is too indefinite to be enforced. Specifically, it claims that the parties did not intend to bind themselves by signing the letter and that the agreement lacked essential terms.

Whether an agreement fails for indefiniteness is a question of law.[26] To be enforceable, the terms of an agreement must be sufficiently definite to enable the court to understand each party's obligations.[27] "It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely

---

[24] *See Dauley*, 535 S.W.2d at 628-29.

[25] *Long Trusts*, 222 S.W.3d at 416 (internal quotation marks and modifications omitted); *see also Gates*, 280 S.W.2d at 248; *Pick*, 659 S.W.2d at 637.

[26] *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 664 (Tex. App.–Dallas 2004, pet. denied).

[27] *Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *see also* Restatement (Second) of Contracts § 33(2) (1981) (contract terms are reasonably certain "if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.").

constitutes an agreement to agree."[28]  Although the parties must agree to all material terms, they may choose to leave non-essential terms open for later negotiation without rendering the agreement unenforceable.[29]  Whether a term is material or essential is a legal question that the court examines on a case-by-case basis.[30]  Ultimately, we must determine "whether the contemplated documentation was a condition precedent to the formation of a contract or simply a memorial of an already enforceable contract."[31]

First, Chesapeake contends the district court erred in concluding that the parties intended to be bound by the July Agreement.  We disagree.  The Agreement stated on its face that it was "valid and binding," was entitled "Offer to Purchase," and provided that Chesapeake's offer would be void if Peak did not accept it by signing the agreement before 5 PM on July 3.  Coe, who negotiated on behalf of Peak, and Jacobson and McClendon, Chesapeake's executive vice president and CEO, respectively, testified they believed the agreement was valid and binding at the time it was executed.[32]  Finally, Chesapeake continually

---

[28] *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 455 (Tex. App.–Fort Worth 2009) (quoting *Fort Worth ISD*, 22 S.W.3d at 846).

[29] *WTG Gas Processing, L.P. v. ConocoPhillips Co.*, 309 S.W.3d 635, 645 (Tex. App.–Houston [14 Dist.] 2010) (citing *Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 556 (Tex. 1972)).

[30] *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *see also APS Capital Corp. v. Mesa Air Group, Inc.*, 580 F.3d 265, 272-73 (5th Cir. 2009) (in determining a contract's essential terms, "[c]ourts look not only at any relevant written agreements but also at the relationship of the parties, their course of dealings, and then answer the field- and fact-specific question of whether essential terms were sufficiently settled to find a contract.").

[31] *Hardman v. Dault*, 2 S.W.3d 378, 380 (Tex. App.–San Antonio 1999).

[32] The district court noted that although a corporate representative testified Chesapeake did not intend the agreement to be binding, this "position and testimony is directly contrary to the affirmative representation made to Peak that the agreement was 'valid and binding.'"

reassured Peak it was not "looking for a way out" of the agreement while the parties were attempting to finalize the transaction's closing documents.

Chesapeake maintains that, despite this evidence to the contrary, the parties could not have intended to be bound by the agreement because they later signed a document that denied any such intent. In September 2008, Chesapeake requested access to Peak's private files so that it could perform its due diligence. Peak agreed, but required Chesapeake to sign a Confidentiality Agreement covering any information obtained about Peak and its clients from the disclosed files. In relevant part, the agreement stated that Chesapeake was receiving access to "certain information relating to the Companies' oil and gas properties...in order for the parties to explore the possibility of entering into, and (if applicable) to negotiate, a potential sales transaction with respect to such assets, properties and business." The final paragraph provided that "[n]othing in this Agreement shall impose any obligation upon the Companies or the Recipient to consummate any business transaction with the other or to enter into any discussions or negotiations with respect thereto."

The district court considered and rejected Chesapeake's contention that the Confidentiality Agreement proved the parties did not intend to be bound by the July Agreement, and we do too. The Confidentiality Agreement was signed several months after the parties executed the July Agreement. As the district court observed, "the confidentiality agreement did not address the substance of the [July Agreement]." Instead, it was a form agreement routinely used by Peak when providing access to its files to another entity. The language in this form agreement does not outweigh other evidence demonstrating the parties' intent to be bound when they signed the July Agreement.

Chesapeake also contends the July Agreement was too indefinite to be enforced because it did not include all essential terms. Essential terms generally include the time of performance, the price to be paid and the service to be

rendered.[33] The July Agreement contained these key elements, as it identified the property to be conveyed, its price, the closing and delivery dates, and the purchaser's interest in the property. It also provided that Chesapeake would have an opportunity to examine title and review any contracts and agreements affecting the lease to ensure they were "reasonably acceptable." Nonetheless, Chesapeake argues the parties failed to have a meeting of minds on other essential elements including the lease schedule, revenue interest, and miscellaneous terms that would have been included in a final Purchase and Sale Agreement.

First, Chesapeake claims the July Agreement is indefinite because it does not include a final lease schedule identifying every lease to be conveyed. Because the parties could not close the transaction until such a schedule was created, Chesapeake argues, the July Agreement was an unenforceable "agreement to agree" or letter of intent.

The absence of closing documents does not necessarily make an agreement non-binding.[34] So long as the agreement contains all essential terms, the need to formalize the transaction with closing documents is not fatal to its enforceability.[35] The identity of the property to be conveyed is an essential term in a purchase agreement. As explained in our discussion of the statute of frauds, the July Agreement adequately described those properties. The lease list, which provides a more formalized description of the conveyed property, is not itself an

---

[33] *See Port Freeport v. RLB Contracting Inc.*, 369 S.W.3d 581, 590 (Tex. App.–Houston [1 Dist.] 2012) (citing *Kirby Lake Dev. Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 838 (Tex. 2010)).

[34] *Castano v. San Felipe Agricultural, Mfg., & Irr. Co.*, 147 S.W.3d 444, 448 (Tex. App.–San Antonio 2004).

[35] *See WTG Gas Processing, L.P.*, 309 S.W.3d at 644-45.

essential term of the agreement. Its absence therefore does not make the July Agreement too indefinite to be enforced.[36]

Chesapeake next claims that an essential term was missing from the agreement because the parties did not reach an agreement on revenue interest. This argument is meritless. The July Agreement clearly provided the leases "shall be delivered at a net revenue interest of not less than seventy-five percent." Chesapeake points out that the day before it informed Peak it would not be completing the purchase, Coe asked Chesapeake to eliminate the 75% requirement. That one party unsuccessfully attempted to retroactively change an essential term does not prove that term had not been previously agreed to and included in the agreement, however.

Finally, Chesapeake claims the agreement lacked terms that would have been included in the final Purchase and Sale Agreement, such as warranties of title, depth limitations, non-compete provisions, and options to purchase additional acreage. The July Agreement, however, did contain depth provisions. Furthermore, Chesapeake identifies no authority for its claim that warranties of title, non-compete provisions and options to purchase additional acreage are essential elements in a conveyance of oil and gas leases, rather than terms that the parties could leave open for later negotiation. The July Agreement was sufficiently definite to be enforced.

---

[36] That the Agreement provided Chesapeake would have an opportunity to examine title to the leases and to review any contracts and agreements affecting the leases and lands covered by the leases, and that these needed to be "reasonably acceptable" to Chesapeake, also does not render the agreement indefinite. Texas courts have explained that an agreement subject to one party's approval is not indefinite if it includes an objective standard – such as "reasonable" – on which that approval must be based. *See Cotton v. Deasey*, 766 S.W.2d 874 (Tex. App.–Dallas 1989); *Atomic Fuel Extraction Corp. v. Slick's Estate*, 386 S.W.2d 180, 185 (Tex. Civ. App.–San Antonio 1965), *writ ref'd n.r.e. per curiam*, 403 S.W.2d 784 (Tex. 1965). Thus, the inclusion of this clause in the agreement did not render it indefinite.

No. 11-41003

V.

In its third attack on the judgment of the district court, Chesapeake contends the July Agreement is unenforceable because Peak cannot perform its obligations under that agreement.

To prevail on a claim for breach of contract, the plaintiff must prove that it performed or tendered performance.[37] The July Agreement stated that "[t]he Leases to be conveyed to Chesapeake by the Seller shall include approximately 5,404.75 net acres and each Lease shall be delivered at a net revenue interest of not less than" 75%. It also contained an adjustment clause stating: "[a]djustments to the Purchase Price based on the Seller delivering more or less than 5,404.75 net acres shall be made in accordance with the allocated value of $15,000 per net acre." At trial, Peak conceded that it could only deliver 1,645.917 acres meeting the agreement's specifications. Chesapeake contends that Peak therefore cannot adequately perform under the agreement. Texas courts have held that a seller fails to tender performance if the amount of acreage it delivers to the buyer differs by 10% or more from the acreage listed in the contract.[38] In this case, the number of acres listed in the contract and the number that can be delivered by Peak diverge by 70%.

Chesapeake is correct that Texas courts may decline to enforce a contract when there is an excessive discrepancy between the amount of acreage listed in the contract and the amount of acres actually delivered. This approach, however, only applies to a sale in gross of a designated tract of land, and not to a sale of land by the acre.[39] In this case, the parties inserted an adjustment

---

[37] *Southern Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 323 (Tex. App.–Houston [1 Dist.] 2011).

[38] *See Slagle v. Clark*, 237 S.W.2d 430, 433-34 (Tex. Civ. App. 1951).

[39] *See, e.g.*, *Slagle*, 329 S.W.2d at 433; *Steward v. Jones*, 633 S.W.2d 544, 545-46 (Tex. App. 6 Dist. 1982); *Lee v. Watson*, 181 S.W.2d 599, 600-01 (Tex. Civ. App. 1944).

17

No. 11-41003

clause in the contract to provide for a change in sale price based on the number of acres actually conveyed.  Furthermore, the record indicates Chesapeake was seeking to acquire any and all property Peak could deliver, that Coe was aware of this, and that both parties knew the total number of acres Peak could deliver was uncertain.    This  demonstrates  the  parties  included  the  word "approximately" before "5,404.75 net acres," the phrase "more or less," and an adjustment clause specifying the per acre price because they were making a sale by the acre for any leases Peak could deliver – no matter how small or scattered – rather than a sale in gross for designated tracts of land.[40]  Given this, we conclude the district court did not err in finding Peak was willing and able to tender performance on the July Agreement.

## VI.

Finally, Chesapeake claims the district court's award of damages was unsupported by the evidence.

As plaintiff, Peak had the burden to prove damages.[41] Following trial, the district court concluded Peak was entitled to $19,751,004 in damages, an amount reached by multiplying the acres subject to the agreement (1,645.917) by $12,000, the difference between the contract price ($15,000 per acre) and the market price on the date of breach ($3,000 per acre).  Chesapeake contends this was in error because Peak failed to show it had 1,645.917 net acres to convey to Chesapeake under the agreement.  We disagree.  Peak submitted a lease list, admitted at trial as Exhibit PX35, which showed all acreage Peak could convey in the Haynesville Shale in Harrison County that met the terms of the July Agreement.  The list demonstrated that Peak and its affiliated entities had a

---

[40] *See Slagle*, 237 S.W.2d at 433 ("[T]he words 'more or less,' when used in a deed indicate a sale in gross, unless there was an understanding qualifying or defining these words.").

[41] *Pizani v. M/V Cotton Blossom*, 669 S.2d 1084, 1088 (5th Cir. 1982).

No. 11-41003

total of 1,943.878282 net acres in the county.  At trial, Coe testified that 297.96 of these acres fell outside of the areas shaded on the Exhibit A map, and therefore that Peak could actually convey 1,645.917 net acres to Chesapeake under the July Agreement.  Coe also testified that Peak could deliver a 75% net revenue interest on all of that acreage.  Given this, we cannot conclude that the district court erred in its calculation of damages.

## VII.

For the above reasons, we affirm the judgment of the district court.[42]

---

[42] Because we conclude that the district court did not err in enforcing the parties' agreement, we need not address Peak's alternative arguments that the agreement was enforceable or that Peak was entitled to damages under a theory of promissory estoppel or fraud.

19