# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00415-CV

---

**Eleanor Powell, Individually and as Independent Executor
for the Estate of Jay Frank Powell, Appellant**

**v.**

**4646 Rockcliff Road Land Trust, Kenneth A. Kalinoski, and Jean M. Kalinoski, Appellees**

---

### FROM THE PROBATE COURT NO. 1 OF TRAVIS COUNTY
### NO. C-1-PB-19-001809, THE HONORABLE GUY S. HERMAN, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Eleanor Powell, Individually and as Independent Executor for the Estate of Jay Frank Powell, appeals from the probate court's order denying her motion for summary judgment; granting summary judgment in favor of appellees 4646 Rockcliff Road Land Trust, Kenneth A. Kalinoski, and Jean M. Kalinoski (collectively, the Kalinoskis); and ordering specific performance on a mediated settlement agreement (MSA) by requiring the Kalinoskis to pay $700,000 and Powell to deliver an executed General Warranty Deed and vacate the property within seventy-five days. We will affirm the probate court's summary-judgment order.

## PROCEDURAL AND FACTUAL SUMMARY[1]

In 2013, when the Kalinoskis bought property that neighbored Eleanor and Jay Powell's property, a boundary dispute arose. In July 2015, the Powells sued the Kalinoskis in district court, asserting claims for trespass to try title and private nuisance. The Kalinoskis answered and counterclaimed for quiet title and trespass. Both sides sought declaratory relief related to the proper boundary line between the two properties.

In February 2017, the parties agreed to the MSA, which provides in relevant part:

1. Defendants have offered to purchase Plaintiffs' property on these terms (the "Offer"): (a) purchase price of seven hundred thousand dollars ($700,000) cash; (b) Defendants will pay all closing costs; (c) closing will occur by April 3, 2017; (d) Plaintiffs may continue to occupy the premises until August 22, 2017, during which time Plaintiffs shall not owe rent but Plaintiffs shall pay utilities and shall obtain and pay for renters insurance; (e) at closing, the parties shall mutually release each other from any and all claims, whether known or unknown, that have been or could have been asserted in the lawsuit in a form of mutual release to be agreed upon by the parties' attorneys; (f) at closing, the parties will jointly move to dismiss the lawsuit with prejudice, each party to bear its own attorney fees and court costs, in a form of dismissal to be agreed upon by the parties' attorneys.

. . .

3. The parties agree to cooperate in good faith in the drafting of the additional documents contemplated in this agreement and to take all additional actions that may be reasonably necessary or appropriate to give full force and effect to the terms and intent of this agreement.

4. This agreement is confidential. The parties will not disclose the terms of this agreement to any third parties except their neighbors, David Richards (who shall be instructed to maintain confidentiality), their financial advisors, and as otherwise required by law.

---

[1] We consider the summary-judgment evidence presented by both parties in determining whether a motion for summary judgment was properly granted. *Expro Ams., LLC v. Sanguine Gas Expl., LLC*, 351 S.W.3d 915, 919 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

On March 22, one of the Kalinoskis' attorneys emailed the Powells' attorney to say that his clients "would like an opportunity to walk through your client's property, sooner than later," and that he wanted to discuss escrow of the purchase funds, extending the closing date, the structure of the settlement agreement, "possible early possession," "Septic and other City certifications," conducting a survey, and removal of the Powells' personal property. On March 23, he wrote again about a "walk through" and said, "I spoke with the title company and we are working on opening escrow and will know more about the closing date in the next day or two." On March 23, the Powells' attorney indicated that a walk through in the beginning of the next week would be preferable but on March 27 wrote, "The Powells do not want the Kalinoskis to inspect the home until some time after closing."

On March 28, the Kalinoskis' attorney emailed the Powells' attorney to say that the Kalinoskis "will request that the money be wired to escrow by Friday" and "can close end of April." She further said:

> Once they close, our clients will be the owners of the property and will be able to come onto the property as they see fit. Given the past relationship between our clients, do you think your clients will be willing to move out by the time we close on the sale of their house? If not, we can always close in the summer when they move out.
>
> Additionally, we will need a survey of the property in order to close the sale. Does your client have a current survey of their property? If not, one will have to be done.

The email concluded, "We just want to be able to go through the normal steps that any buyer would go through when purchasing a piece of property."

On March 29, the Powells' attorney responded that the Powells would agree to an extension only to April 10 and would "seek to enforce" the MSA "should the sale not close by April 10." The Powells' attorney asserted that the MSA "does not state nor suggest that the money will be escrowed until the Powells move"; that they intended to remain on the property until August; and that "[t]here have been multiple surveys" of the property and that the Kalinoskis should use whichever survey that they "feel[] is most accurate." The attorney stated:

> As for the notion that your clients will be able "to come onto the property as they see fit", once the sale closes—per your clients' terms of the settlement, the Powells will be renters and as such, will be afforded all rights and remedies that renters have, including the quiet enjoyment of their property. Once the sale closes, the [Kalinoskis] can schedule a time with the Powells, through my office, to inspect the property.

On March 29, the Powells filed the MSA in the district court. The next day, the Kalinoskis responded by filing a motion to set aside or, alternatively, clarify the MSA, asserting that by filing the MSA in the court's public records, the Powells had breached the MSA's provision related to confidentiality. Alternatively, the Kalinoskis sought clarification of the MSA, asking the court to determine "whether the agreement allows the parties to undergo the normal activities associated when purchasing a house." The motion did not specify what items or activities were sought. The same day, the Kalinoskis placed $700,000 into escrow with Austin Title Company.

On March 31, the Powells' attorney emailed the Kalinoskis' attorney, attaching a "completed Seller's Disclosure Statement"[2] and clarifying that the Powells were not making "any representations or warranties about the condition of anything in, on, or around the property,

---

[2] The appellate record does not include the actual disclosure statement.

4

as it is being sold as is, where is." He also informed the Kalinoskis that the Powells had obtained renter's insurance, which they would start upon closing. The Powells' attorney then stated that the Kalinoskis' Motion to Clarify the MSA "seems as if you are adding material terms, rather than clarifying." He asserted that the MSA was "not ambiguous" and that the Kalinoskis' motion to clarify did not "state what 'usual and customary items associated with purchasing a piece of real property/house' are, but if it is inspections and disclosures and surveys, those items could have been and should have been included in the MSA if that is what your client wanted."[3] The attorney concluded, "[I]t would be in everyone's best interest if the sale were to conclude on April 10th. To that end, I'm happy to send over a proposed Special Warranty Deed."

On April 11, at 11:00 a.m., the Powells sent a letter rescinding the MSA, asserting that the Kalinoskis "are in total and material breach of the clear terms of the MSA by failing to close on the sale of the property by April 3, 2017 (which was extended to April 10, 2017)," and that the Powells "had complied with all requirement [sic] of them under the MSA." On April 19, the Kalinoskis filed a notice withdrawing their motion to set aside or clarify the MSA, and on April 28, they filed a motion to enforce the MSA.

In September 2019, the case was transferred to the probate court after Jay Powell passed away. The parties then filed dueling motions for summary judgment. In addition to the emails and communications summarized above, the parties also produced records showing that the Kalinoskis placed $700,000 in escrow with Austin Title Company on March 30; excerpts from the parties' depositions; an affidavit by Kenneth Kalinoski; a copy of a Notice of Federal

---

[3] Powell asserts that their attorney's March 31 letter shows that she and her husband "did agree to an inspection of the property on April 20, 2017, after closing occurred." Their attorney's letter opens with, "The 20th is fine," in answer to the Kalinoskis' attorney's inquiry, "Does April 20th work for you?" However, the record does not include information to show that the attorneys were discussing an inspection date in that exchange.

Tax Lien in the amount of about $29,093 against taxpayer J. Frank Powell (Jay Powell's full name was Jay Frank Powell); an email from Austin Title Company stating that the company was not sure if the lien was against Jay Powell or someone with a similar name and attaching a "Statement of Identity" for Jay to complete; an email from the City of Austin Code Department indicating that there were "some open permits and fines" on the Powells' property; and emails between Austin Title Company and Kenneth Kalinoski, in which he stated that he and his wife "don't have a survey and Powells will not give us their survey(s)," and the title company responded, "As you are in a dispute with them, it's best you get your own anyway."

In his deposition, Kenneth Kalinoski testified that under the MSA, he and his wife were required to pay the Powells $700,000, pay all closing costs, and allow the Powells to live in the property until August 2017, while the Powells were required to obtain and pay for renter's insurance and utilities. He agreed that the renter's insurance was the "only thing specified that the [Powells] were required to do to close the property" and that they complied with that requirement. However, he disagreed that the insurance was the only requirement placed upon the Powells by the MSA, testifying that they had also agreed, along with the Kalinoskis, to "work together in good faith to draft any additional documents that are contemplated in this kind of an agreement. This is a closing agreement. This is a purchase of a home agreement. So, yes, there are additional actions that were required by both parties." Kenneth said he never spoke directly to the Powells, including to notify them that the money had been placed in escrow, but that his attorney knew "that the money arrived on Wednesday, March the 28th, week ahead of time." He opined that other items like surveys and title insurance "were contemplated under the catch-all paragraph 3," although he agreed that he could have asked specifically to have those items included in the MSA but did not.

In his affidavit, Kenneth averred that after the MSA was finalized, he and his wife "sold various assets to liquidate capital" to pay for the property and "escrow[ed] the purchase funds with Austin Title Company" through a March 30, 2017 wire transfer to the title company's escrow account. They also worked with the title company "in order to purchase [the property] to perform the Title Search"; obtained home insurance and "Landlord Rental" insurance; contacted survey companies to do a survey of the property; communicated with the City of Austin about "any open code violations, outstanding fines or other fees on" the property; placed in Powell's mailbox "a hard copy of the Property Condition promulgated form from the Texas Real Estate Commission (TREC) for Sellers Property Condition Disclosure including sellers disclosure of lead based paint and lead based paint hazards as is required by Federal law"; and asked Powell "in a written letter to fill out the form and return it directly to our mailbox."

Kenneth explained that the title search, which concluded on April 3, 2017, found a $29,000 tax lien "listed against the Powell[s'] property." He further stated that the title company required an updated survey "to issue a title policy for the purchase of the Powell Property with Boundary Line Coverage and Parties in Possession Coverage" and suggested that the Kalinoskis "not rely on any Powell survey but rather hire our own surveyor to complete this task." Kenneth spoke to three companies he believed the Powells had hired during the dispute, but none of those companies had ever completed a survey for the Powells. The Kalinoskis then hired Mike McMinn Land Survey Company, but McMinn told them "that he would be unable to do the survey as Mr. Powell refused to give him permission to enter the Property."

Kenneth further averred that two home-insurance companies informed him and his wife that due to the age of the Powells' residence, an inspection report would be required to provide information about the home's wiring, breakers, and roofing. However, the Powells

7

refused to allow the Kalinoskis or any of their agents to inspect the property before closing. Finally, Kenneth stated that the City of Austin advised the Kalinoskis that the property "was exposed to four (4) outstanding code compliance permit issues that required a site plan exemption." In addition, there were "several outstanding fines and fees" and an "ongoing fee of $2000.00/day until the violations are corrected," which Kenneth said would transfer to the Kalinoskis upon purchase "if the situation was not remedied prior to our sale."

## DISCUSSION

Powell argues that the probate court erred in granting summary judgment in favor of the Kalinoskis because (1) the Powells did not materially breach the MSA so as to entitle the Kalinoskis to specific performance; (2) the Kalinoskis breached the MSA, entitling the Powells to rescind the agreement; and (3) alternatively, there were genuine issues of material fact as to the interpretation of the MSA and the parties' conduct. Powell further argues that the probate court erred in denying her request for injunctive relief related to her claim that the Kalinoskis had violated the property's restrictive covenants. We begin with the probate court's decision granting judgment for the Kalinoskis.

Texas public policy encourages "the early settlement of pending litigation through voluntary settlement procedures." Tex. Civ. Prac. & Rem. Code § 154.002. A mediated settlement agreement is enforceable in the same manner as any other contract. *Id*. § 154.071(a); *Castano v. San Felipe Agric., Mfg., & Irr. Co.*, 147 S.W.3d 444, 448 (Tex. App.—San Antonio 2004, no pet.). To recover for breach of contract, the claimant must establish the existence of a valid contract, performance or tendered performance, breach, and damages. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019); *Levetz v. Sutton*,

8

404 S.W.3d 798, 803 (Tex. App.—Dallas 2013, pet. denied). Specific performance is an equitable remedy that may be awarded in certain circumstances as an alternative to damages upon a showing of breach of contract. *Pathfinder Oil & Gas*, 574 S.W.3d at 887. "[T]o be entitled to specific performance, the plaintiff must show that it has substantially performed its part of the contract, and that it is able to continue performing its part of the agreement." *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593-94, 601 (Tex. 2008) (quoting 25 Richard A. Lord, Williston on Contracts § 67:15, at 236-37 (4th ed. 2002)). "In the context of a real estate contract, compliance with all terms of the contract means that the buyer of land who is seeking specific performance must prove an actual tender of the purchase price." *Marx v. FDP, LP*, 474 S.W.3d 368, 374 (Tex. App.—San Antonio 2015, pet. denied) (citing *DiGiuseppe*, 269 S.W.3d at 594).

When both parties move for summary judgment, each party bears the burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 3-4 (Tex. 2014); *see* Tex. R. Civ. P. 166a(c). When, as here, both parties move for summary judgment on overlapping issues and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides, determine all questions presented, and if we determine that the trial court erred, render the judgment the trial court should have rendered. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). We review the evidence presented by the parties in the light most favorable to "the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

9

Powell argues that the Kalinoskis' conduct leading up to the closing date "indicated a clear intent not to perform in accordance with the [MSA's] terms" and "constituted an anticipatory repudiation" of the MSA. *See Van Polen v. Wisch*, 23 S.W.3d 510, 516 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ("Repudiation or anticipatory breach is a positive and unconditional refusal to perform the contract in the future, expressed either before performance is due or after partial performance."). As evidence of that intent, she asserts that the Kalinoskis' attorney told the Powells on March 28 that if they did not move out of the house in April upon closing, they would not receive the purchase money until August, when they moved out. However, Powell's characterization of the attorney's email is not entirely accurate. In the context of the Kalinoskis seeking to inspect the property and the Powells resisting those efforts, the Kalinoskis' attorney first stated that upon closing, his clients would have the right to enter onto the property, then asked whether the Powells would "be willing to move out" by the April closing and suggested that the parties "can always close in the summer when they move out." Thus, although the Kalinoskis may have wished to conduct further due diligence and did suggest that the Powells might want to postpone closing and maintain ownership throughout their possession of the property, they did not insist on any changes or make them a condition of the transaction. Further, after the Powells responded on March 29 that as renters, they would have the right to enjoy the property and that the parties would have to negotiate a mutually agreeable time for an inspection, the record does not reflect that the Kalinoskis insisted that the Powells either move out in April or wait until August to receive the purchase money. Instead, the Kalinoskis deposited $700,000 into escrow the day after the Powells' response.

Powell also asserts that the Kalinoskis indicated their intent not to perform by stating that "they required a survey . . . as a condition to closing"; by filing their motion to set

aside or clarify the MSA; and by failing to "pay the purchase money proceeds to the Powells," tell the Powells that they had deposited the funds in escrow, or "communicate with the Powells that they were taking any further steps to close." However, as Kenneth averred, the survey was requested by the title company during the process of arranging title insurance, which fairly falls within the MSA's third paragraph, requiring the parties to cooperate on documents and actions "reasonably necessary or appropriate" to conclude the sale, and the record does not reflect that the Kalinoskis expressed an intention to hold up the closing until the Powells agreed to a survey.

The MSA requires the Kalinoskis to pay $700,000 for the property and allow the Powells to stay in the house until August, the Powells to obtain renter's insurance and pay utilities through their August move-out, and both sides to cooperate with closing requirements. It does not require the Kalinoskis to pay the purchase funds to the Powells directly, inform the Powells about the deposit into escrow (and the record shows that Kalinoskis' attorney in fact did inform the Powells' attorney that the Kalinoskis would be depositing the money into escrow), or communicate with the Powells about progress toward closing.[4] The Kalinoskis' lack of communication about closing specifics cannot be viewed as indicating their intention not to perform, *see Builders Sand, Inc. v. Turtur*, 678 S.W.2d 115, 120 (Tex. App.—Houston [14th Dist. 1984, no writ) ("An anticipatory repudiation of a contract may consist of either words or actions by a party to a contract that indicate an intention that he or she is not going to perform the contract according to its terms in the future."), particularly given that they had deposited the full purchase funds into escrow on March 30, *see Marx*, 474 S.W.3d at 374 (in real estate,

---

[4] The MSA does not specify that either party would be responsible for communicating about or arranging the details of the closing, and the record does not include any information about whether the specifics of the closing transaction were discussed between the parties or the parties and the title company.

11

compliance with sales contract means buyer seeking specific performance must prove "actual tender of the purchase price").

The parties do not dispute whether they intended for the MSA to be binding, and "[p]arties may enter into a binding settlement agreement even if the parties contemplate that a more formal document memorializing the agreement will be executed at a later date." *Herring v. Heron Lakes Ests. Owners Ass'n, Inc.*, No. 14-09-00772-CV, 2011 WL 2739517, at *2 (Tex. App.—Houston [14th Dist.] Jan. 4, 2011, no pet.) (mem. op.); *see Coe v. Chesapeake Expl., L.L.C.*, 695 F.3d 311, 322 (5th Cir. 2012) ("The absence of closing documents does not necessarily make an agreement non-binding," and if "agreement contains all essential terms, the need to formalize the transaction with closing documents is not fatal to its enforceability."); *Castano*, 147 S.W.3d at 448 (MSA referenced need for additional documents "necessary to 'implement the provisions and spirit of'" MSA; court of appeals held that statements referring to additional documents, closing, or "performance 'subject to' further action" did not raise fact issue as to whether parties intended to be bound by terms of MSA); *Hardman v. Dault*, 2 S.W.3d 378, 381 (Tex. App.—San Antonio 1999, no pet.) (settlement agreement may be binding if no fact issue exists as to whether parties intended agreement to be binding and agreement contains all essential terms and does not indicate that parties intended agreement to be contingent on later action). Thus, the fact that the MSA, which indicates that the parties intended to be bound by it, contemplates the completion of additional documents in the future does not render the agreement unenforceable.

The Kalinoskis established as a matter of law that a valid contract existed in the form of the MSA, that they fully tendered performance, that the Powells breached the contract by failing to complete the sale and instead seeking to rescind the MSA, and that the Kalinoskis were

12

harmed by the Powells' breach of the MSA. *See Pathfinder Oil & Gas*, 574 S.W.3d at 890; *DiGiuseppe*, 269 S.W.3d at 594; *Marx*, 474 S.W.3d at 374. The Kalinoskis also presented evidence establishing that the Powells breached the MSA's cooperation requirement by refusing to allow the Kalinoskis or their agents to conduct a survey or inspect the property.[5] Powell did not raise a fact issue as to whether the Kalinoskis attempted to change or add to the MSA's material terms, breached the MSA, or indicated an intent to do so. There is no evidence indicating that the failure to close by April 10 can be attributed to the Kalinoskis. The probate court thus did not err in granting the Kalinoskis' motion for summary judgment and request for specific performance. We overrule Powell's first issue on appeal. Because the probate court properly granted summary judgment and specific performance in favor of the Kalinoskis, Powell's second issue, which contests the court's ruling on the parties' boundary dispute, is moot.

## CONCLUSION

We have overruled Powell's first issue and held that her second issue is moot. We therefore affirm the probate court's order denying her motion for summary judgment, granting the Kalinoskis' motion for summary judgment, and granting the Kalinoskis' request for specific performance.

---

[5] Certainly, the MSA's cooperation requirement leaves much to be desired in terms of specificity. However, despite the clause's lack of specificity, the record shows that the Powells did not cooperate in good faith with the Kalinoskis' reasonable efforts to obtain additional information, as recommended or requested by the title company and at least one homeowner's insurer or in response to information provided to the Kalinoskis by the City of Austin.

13

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:   March 2, 2022